UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

3D ENTERPRISES GROUP OF
FLORIDA, INC.,

              Plaintiff,

and                          Case No.: 8:09-cv-576-T-33TBM

OCALA RESTAURANT PARTNERS,
INC.,

      Rule 19 Involuntary
      Plaintiff,

v.

UNDERWRITERS AT LLOYD'S,
LONDON,

              Defendant.

_____/

## ORDER

    This matter comes before the Court pursuant to cross
motions for summary judgment. Plaintiff 3D Enterprises
Group of Florida, Inc. filed its Motion for Summary Judgment
(Doc. # 64) on November 2, 2010. Defendant Underwriters at
Lloyd's London filed its Motion for Summary Judgment (Doc. #
73) on November 29, 2010. Underwriters filed its Response
in Opposition (Doc. # 70) to 3D's Motion for Summary
Judgment on November 29, 2010. 3D filed its Response in
Opposition (Doc. # 83) to Underwriters's Motion for Summary

Judgment on December 16, 2010.

Also before this Court are 3D's Motions to Strike: (i) Underwriters's Motion for Summary Judgment (Doc. # 76); (ii) certain deposition transcripts (Doc. # 78); and (iii) the affidavit of Jack Goldin (Doc. # 79). Underwriters filed Responses in Opposition to 3D's Motions to Strike (Docs. ## 84; 86) on December 22, 2010, and December 30, 2010, respectively.

In this dispute regarding fire insurance, 3D is the named insured under insurance policy 26968, issued by Underwriters. (Doc. # 45-1 at 5). Ocala Restaurant Partners is the loss-payee under the policy, and according to 3D, also the mortgagee. (Doc. # 45-1 at 12-13). 3D asserts that after a fire burned the insured's restaurant and certain business property, Underwriters refused to honor 3D's claim under the insurance policy, and refused to pay benefits to either 3D or Ocala. (Doc. # 45 at 2).

3D's complaint against Underwriters seeks declaratory relief and damages. (Doc. # 45). In count one, 3D submits that although the insurance policy was in effect on the date of the fire, Underwriters refuses to recognize Ocala as the loss-payee and mortgagee, and denied 3D's claim based on an

alleged breach of a protective safeguard provision in the policy regarding a fire alarm. (Doc. # 45 at 2-3). 3D seeks a declaration from this Court that "Ocala is the named Loss-Payee and named Mortgagee under the policy of insurance and [is] entitled to payment of policy benefits under the policy of insurance." (Doc. # 45 at 4).

In count two, 3D seeks damages and attorney's fees arising out of Underwriters's alleged breach of the insurance contract. (Doc. # 45 at 5-7). In count three, 3D asserts a cause of action for conversion, arguing that Underwriters wrongfully removed certain business property located at the restaurant after the fire. (Doc. # 45 at 7).

## I.  <u>Factual Background</u>

3D operated a Cody's Original Roadhouse Restaurant, located in Ocala, Florida. (Doc. # 64 at 2; Doc. # 63-4 at 1). The property, restaurant building, and certain restaurant equipment used to operate the restaurant was owned by Ocala, which leased these items to 3D. (Docs. # 64 at 2; Doc. # 71-1 at 1). On August 16, 2007, the restaurant caught fire and burned. (Doc. # 64 at 3). According to 3D, Ocala maintained an alarm system which was "connected to a central station." (Doc. # 63-2 at ¶ 8). Underwriters points

out that 3D bases this assertion on Ocala's response to request for admissions, where Ocala admitted only that it "had a security system when it [Ocala] occupied the premises." (Doc. # 70 at 3; Doc. # 63-2 at 2). Underwriters asserts this "excludes the period of time that 3D occupied the property." (Doc. # 70 at 3).

Prior to the fire, Underwriters issued 3D a policy of commercial property insurance protecting the restaurant, building, and certain business property from loss. (Doc. # 45-1). Initially, the policy listed Ocala as a loss-payee. (Doc. # 45-1 at 13). Thereafter, but before the fire, Underwriters issued an additional endorsement to the policy which listed Ocala as both a loss-payee and a mortgagee. (Doc. # 45-1 at 12).

3D alleges that pursuant to the lease between Ocala and 3D, 3D was required to have the full protection of a mortgagee loss-payable endorsement on the insurance policy for the protection of Ocala. (Doc. # 64 at 3). On the other hand, Underwriters submits that the lease simply indicates that Ocala must be an additional insured on any policy. (Docs. ## 70 at 3; 71-1 at 6).

The insurance policy endorsement mortgagee clause

-4-

provides, in pertinent part:

**Mortgageholders**
a.   The term mortgageholder includes trustee.
b.   We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear.
c.   The mortgageholder has the right to receive loss payment even if the mortgageholder has started foreclosure or similar action on the building or structure.
d.   If we deny your claim because of your acts or because you have failed to comply with the terms of this Coverage Part, the mortgageholder will still have the right to receive loss payment if the mortgageholder:
     (1)  Pays any premium due under this Coverage Part at our request if you have failed to do so;
     (2)  Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and
     (3)  Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.
All of the terms of this Coverage Part will then apply directly to the mortgageholder.
e.   If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:
     (1)  The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and
     (2)  The mortgageholder's right to recover the full amount of the mortgageholder's claim will not be impaired.

(Doc. # 45-1 at 31).

According to 3D, following the fire, Underwriters

-5-

retained Jack Goldin of the independent adjusting firm Cramer, Johnson and Wiggins to adjust and investigate 3D's claim. (Doc. # 63-5 at ¶ 6). On September 27, 2007, Mr. Goldin contacted and retained independent salvage consultant Donald Wilemon. (Doc. # 63-3 at 6, 50). Thereafter, on October 4, 2007, Mr. Goldin, Mr. Wilemon, representatives of Ocala, and others, met at the site of the fire for the purpose of preparing an inventory of the business property. (Doc. # 63-3 at 17-18, 61).

At this meeting, a representative of Cramer, Johnson and Wiggins provided Mr. Wilemon with a list of business property owned by Ocala and a list of business property owned by 3D. (Doc. # 63-3 at 19-20, 23-24). By January of 2008, the business property was sold for $3,500.00. (Doc. # 63-3 at 23-30, 64).

There is significant debate between the parties as to the events surrounding the salvage and sale of the business property. 3D submits that it did not authorize or consent to the sale of its business property, and had no knowledge of the sale. (Doc. # 64 at 4-5; Doc. # 63-3 at 27-30, 64). On the other hand, Underwriters asserts that Raymond Daher, the owner of 3D, was on the property with the adjuster and

Mr. Goldin on the day the property was inventoried, and that Mr. Daher appeared concerned as to what payment 3D would receive for its equipment. (Doc. # 70 at 4; Doc. # 63-3 at 22-23). Furthermore, Underwriters submits that Mr. Daher was present when Mr. Wilemon was on the property for the first time, and 3D's public adjuster was present when Mr. Wilemon was there during the salvage. (Doc. # 70 at 4; Doc. # 63-3 at 64).

On January 17, 2008, counsel for Underwriters sent 3D a letter indicating that it was still investigating 3D's claim under the insurance policy. (Doc. # 63-6). In April of 2008, Mr. Wilemon forwarded a check to Cramer, Johnson and Wiggins representing the proceeds from the sale of the business property. (Doc. # 63-3 at 54). According to 3D, neither Cramer, Johnson and Wiggins nor Underwriters forwarded the proceeds to 3D or notified 3D that they were in possession of the sale proceeds. (Doc. # 64 at 5).

On October 22, 2008, counsel for Underwriters informed 3D that its claim under the insurance policy had been denied. (Doc. # 63-7). Underwriters asserted that 3D breached a policy condition by failing to maintain

-7-

sufficient fire protective safeguards.  <u>Id.</u>  Underwriters

directed 3D to the following policy provision:

> PROTECTIVE SAFEGUARDS
>
> 1.  As a condition of this insurance, you are required
> to maintain the protective devices or services listed
> in the Schedule above.
> 2.  The protective safeguards to which this endorsement
> applies are identified by the following symbols:
> . . .
> "P-2" Automatic Fire Alarm, protecting the entire
> building, that is:
> a. Connected to a central station; or
> b. Reporting to a public or private fire alarm
> system.
> . . .
> We will not pay for loss or damage caused by or
> resulting from fire, if, prior to the fire, you:
> . . .
> 2. Failed to maintain any protective safeguard
> listed in the Schedule above, and over which you
> had control, in complete working order.

(Doc. # 1-3 at 21).

Thereafter, by letter dated April 6, 2009, counsel for

Underwriters forwarded two checks from the salvage and sale

of the business property to counsel for 3D: $3,500.00 for

the salvaged property; and $449.49 for interest on the same.

(Doc. # 63-8).  The insurance policy provides that:

> If either you or we recover any property after
> loss settlement, that party must give the other
> prompt notice.  At your option, the property will
> be returned to you.  You must then return to us
> the amount we paid to you for the property.  We

–8–

> will pay recovery expenses and the expenses to
> repair the recovered property, subject to the
> Limit of Insurance.

(Doc. # 45-1 at 28).

## II. Motions to Strike

Before delving into the summary judgment analysis, this Court will address the merits of 3D's Motions to Strike.  A motion to strike "is a drastic remedy to be resorted to only when required for the purposes of justice." Tracfone Wireless, Inc. v. Access Telecom, Inc., 642 F. Supp. 2d 1354, 1361 (S.D. Fla. 2009)(quoting Augustus v. Bd. of Public Instruction of Escambia County, Fla., 306 F.2d 862, 868 (5th Cir. 1962); Exhibit Icons, LLC v. XP Cos., LLC, 609 F. Supp. 2d 1282, 1300 (S.D. Fla. 2009) (same)).

"[A] motion to strike will usually be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties." BB In Tech. Co., Ltd. v. JAF, LLC, 242 F.R.D. 632, 641 (S.D. Fla. 2007) (quotations omitted); see In re Se. Banking Corp. Sec. & Loan Loss Reserves Litig., 147 F. Supp. 2d 1348, 1355 (S.D. Fla. 2001).

### A.   Motion to Strike Underwriters's Motion for Summary Judgment

First, 3D argues that the Court should strike

-9-

Underwriters's Motion for Summary Judgment in its entirety. (Doc. # 76).  In essence, 3D submits that the Court should strike Underwriters's Motion for Summary Judgment because it incorporates arguments and facts contained in Underwriters's other papers, particularly Underwriters's late-filed response[1] to 3D's own Motion for Summary Judgment.  (Doc. # 76 at 2-3).

3D has submitted a thorough response to Underwriters's Motion for Summary Judgment, (Doc. # 83), such that 3D's complaints as to its ability to respond to the motion as written are rendered moot.  Moreover, this Court does not find, nor does 3D assert, that 3D will suffer prejudice as a result of Underwriters's Motion for Summary Judgment as written.  This Court finds that the drastic remedy of striking is not appropriate, and 3D's Motion to Strike Underwriters's Motion for Summary Judgment (Doc. # 76) is denied.

**B.    Motion to Strike Certain Deposition Transcripts**

Next, 3D moves the Court to strike certain deposition transcripts Underwriters filed in support of its Response in

---

[1] On February 3, 2011, this Court denied 3D's Motion to Strike Underwriters's Response in Opposition to 3D's Motion for Summary Judgment.  (Doc. # 88).

Opposition to 3D's Motion for Summary Judgment. (Doc. # 78). Particularly, 3D requests that the Court strike Underwriters's Exhibits 6, 7, 8, and 9; respectively, the depositions of John Dauenheimer, Lorraine Failing, and Roland Null. (Doc. # 78 at 1). In support of its motion, 3D submits that: (i) it was not provided with notice of the depositions; and (ii) the depositions were conducted in a separate state court action where 3D is not a party. (Doc. # 78 at 1). For the reasons that follow, this Court denies this Motion to Strike.

On one hand, 3D asserts that the depositions at issue are inadmissible and cannot be considered as part of the summary judgment record in this matter because they were taken in a separate state court proceeding in which 3D is not a party, and 3D was not given notice of the depositions. (Doc. # 78 at 1, 4). 3D relies on Federal Rules of Civil Procedure 30(b)(1), 32(a)(1)(A), and 32(a)(8), which govern notice and use of depositions in court proceedings. Id. at 1.

On the other hand, Underwriters relies on Vondriska v. Cugno, 368 Fed. App'x 7, 8-9 (11th Cir. 2010), for its position that the testimony contained in depositions, "even

-11-

those taken without notice to or the presence of the . . . non-moving party on summary judgment," may be considered by the Court. (Doc. # 86 at 3-4). In <u>Vondriska</u>, the Eleventh Circuit held that the district court abused its discretion when it held that Rule 32(a) controlled the admission of certain deposition testimony. The court explained

> In order to support a motion for summary judgment
> under Rule 56(e), testimony must be sworn,
> competent and on personal knowledge, and set out
> facts that would be admissible in evidence at
> trial. Depositions, even those taken without
> notice to or the presence of the later non-moving
> party on summary judgment, can contain such
> testimony. First of all, like an affidavit, the
> testimony is sworn. Therefore, it is admissible
> to the extent that the deponent's testimony was
> competent, on personal knowledge, and set out
> facts admissible at trial. <u>See</u> <u>Bozeman v. Orum</u>,
> 422 F.3d 1265, 1267 n. 1 (11th Cir. 2005) (holding
> that sworn statements before a court reporter
> where non-moving party was neither noticed nor
> present satisfied requirements of Rule 56(e)); 8A
> Wright, Miller & Marcus, Federal Practice and
> Procedure § 2142 (2d ed. 1994) (stating that
> deposition testimony is "at least as good as an
> affidavit and should be usable whenever an
> affidavit would be permissible").

<u>Vondriska</u>, 368 Fed. App'x at 9.

The Eleventh Circuit concluded that the district court should have considered the testimony contained in the depositions so long as that the testimony satisfied the other requirements of Rule 56. <u>Id.</u> Pursuant to Rule

-12-

56(c)(4), testimony filed in support a motion for summary judgment must be competent, made on personal knowledge, and set out facts that would be admissible in evidence.  Fed. R. Civ. P. 56(c)(4).

3D has not alleged that the testimony contained in the depositions at issue violates any provision of Rule 56. Rather, 3D's sole arguments are that the depositions were taken in a case where 3D is not a party, and that 3D did not receive notice of the depositions.  (Doc. # 78 at 1).  The Court has reviewed the deposition testimony at issue and finds it appropriate.  For the foregoing reasons, 3D's Motion to Strike Certain Deposition Transcripts filed in Opposition to 3D's Motion for Summary Judgment (Doc. # 78), is denied.

**C.   <u>Motion to Strike the Affidavit of Jack Goldin</u>**

Finally, 3D moves the Court to strike the affidavit of Jack Goldin filed in support of Underwriters's Motion for Summary Judgment.  (Doc. # 79).  Particularly, 3D requests that the Court strike paragraphs 10, 11, 12, 13, 15, 16, 17, and 18 of Mr. Goldin's affidavit.  (Doc. # 79 at 1).  3D argues that Mr. Goldin's affidavit sets forth facts which would be inadmissible at trial pursuant to Rule 56.

Rule 56(c)(4) provides that "[a]n affidavit . . . used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).

In essence, 3D argues that certain paragraphs within Mr. Goldin's affidavit contain hearsay or are statements made without personal knowledge, such that those statements would not be admissible at trial.  (Doc. #79 at 5).  This Court has reviewed the affidavit and finds that, while it could be construed as containing some hearsay, the affidavit is based on personal knowledge and is otherwise sufficient to survive the Motion to Strike.  This Court is capable of separating the wheat from the chaff and will not credit improper affidavit statements.  Thus, this Court denies 3D's Motion to Strike (Doc. # 79) the Affidavit of Jack Goldin.

## III. <u>Legal Standard</u>

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

-14-

P. 56(a).  A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  <u>Mize v. Jefferson City Bd. of Educ.</u>, 93 F.3d 739, 742 (11th Cir. 1996)(citing <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913, 919 (11th Cir. 1993)).  A fact is material if it may affect the outcome of the suit under the governing law.  <u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642, 646 (11th Cir. 1997).  The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  <u>Hickson Corp. v. N. Crossarm Co., Inc.</u>, 357 F.3d 1256, 1260 (11th Cir. 2004)(citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)).  "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing

-15-

that there is a genuine issue for trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593-94 (11th Cir. 1995)(quoting <u>Celotex</u>, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. <u>Shotz v. City of Plantation, Fla.</u>, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. <u>Samples ex rel. Samples v. City of Atlanta</u>, 846 F.2d 1328, 1330 (11th Cir. 1988)(citing <u>Augusta Iron & Steel Works, Inc. v. Emp'rs Ins. of Wausau</u>, 835 F.2d 855, 856 (11th Cir. 1988)).

## IV. <u>Analysis</u>

In this diversity case, the Court applies the substantive law of the forum state- here, Florida- unless federal law compels a contrary result. <u>Tech. Coating Apps., Inc. v. United States Fid. & Guar. Co.</u>, 157 F.3d 843, 844 (11th Cir. 1998). This Court must apply Florida law in the same manner that the Florida Supreme Court would apply it.

See <u>Brown v. Nicholas</u>, 8 F.3d 770, 773 (11th Cir. 1993).

Pursuant to Florida law, the interpretation of an insurance contract is a matter of law for the court to decide. <u>Gas Kwick, Ins. v. United Pac. Inc. Co.</u>, 58 F.3d 1536, 1538-39 (11th Cir. 1995). Courts "must construe an insurance contract in its entirety, striving to give every provision meaning and effect." <u>Id.</u> at 1539 (citing <u>Dahl-Eimers v. Mut. of Omaha Life Ins. Co.</u>, 986 F.2d 1379, 1382 (11th Cir. 1993)).

Furthermore, the Eleventh Circuit noted that "insurance contracts are to be construed in a manner that is reasonable, practical, sensible, and just . . . . Terms used in a policy are given their plain and ordinary meaning and read in the light of the skill and experience of ordinary people. Provisions that exclude or limit liability of an insurer are construed more strictly than provisions that provide coverage." <u>United States Fire Ins. Co. v. Freedom Village of Sun City Ctr., Ltd.</u>, 279 F. App'x 879, 880-81 (11th Cir. 2008)(citations omitted).

**A.    <u>3D's Motion for Summary Judgment</u>**

**1.    <u>Declaratory Judgment</u>**

First, 3D asserts that it is entitled to a declaration

that Underwriters cannot rely on the protective safeguard
provision as to the fire alarm to deny 3D's claim. (Doc. #
64 at 6). 3D submits that Underwriters was required to
provide a copy of the policy, containing all of the
conditions, to 3D in order to enforce the protective
safeguard provision against 3D. (Doc. # 64 at 7).

3D argues that Underwriters failed to provide 3D with a
copy of the policy containing the protective safeguard
condition such that Underwriters is precluded from enforcing
the protective safeguard condition against 3D to deny
coverage. (Doc. # 64 at 7, 17). Underwriters asserts that
3D's insurance agent, Insurance Service of Sarasota,
received two copies of the insurance policy -- a copy for 3D
and a copy for the insurance agent. (Doc. # 71-7 at 64-65).
Underwriters also submits that 3D's owner, Raymond Daher,
received a copy of the policy. (Doc. # 63-1 at 12-13).

"[A]n insurer may be estopped by its conduct from
seeking a Forfeiture of a policy. . . ." <u>Lloyds Underwriters
at London v. Keystone Equip. Fin. Corp.</u>, 25 So. 3d 89, 92
(Fla. 4th DCA 2009). In <u>Keystone</u>, the insurer appealed a
final summary judgment finding that the insurer was estopped
from relying on an insurance policy provision that would

-18-

have provided a basis for the insurer to deny the insured's claim. Id. at 90. The policy provision required the insured to warrant that the insured would keep the insured's property, a tractor-trailer, in a closed garage, a guarded lot, or parked next to the insured's home. Id. at 91. Breach of this warranty, the policy stated, "shall result in denial of claim or any rights of recovery hereunder." Id. After the tractor-trailer was stolen, the insurer denied coverage based on the insured's breach of the warranty. Id.

The insured argued that the insurer had waived its right to rely, or was estopped from relying, upon the breach of the warranty to justify denying the insured's claim because the insurer failed to provide the insured with a copy of the insurance policy, in violation of applicable Florida law. Id. The court affirmed the trial court's finding that the insurer was estopped from denying coverage based on the insured's failure to comply with the warranty because the insurer failed to provide the insured with a copy, or any other notice of the warranty in the insurance policy. Id. at 95.

In this pertinent part, the protective safeguard provision in this matter states that

PROTECTIVE SAFEGUARDS

1.  As a condition of this insurance, you are required
to maintain the protective devices or services listed
in the Schedule above.
2.  The protective safeguards to which this endorsement
applies are identified by the following symbols:
. . .
"P-2" Automatic Fire Alarm, protecting the entire
building, that is:
a. Connected to a central station; or
b. Reporting to a public or private fire alarm
system.
. . .
We will not pay for loss or damage caused by or
resulting from fire, if, prior to the fire, you:
. . .
2. Failed to maintain any protective safeguard
listed in the Schedule above, and over which you
had control, in complete working order.

(Doc. # 1-3 at 21).

3D asserts that Underwriters may not deny coverage
based on this provision because Underwriters failed to
provide 3D with a copy of the insurance policy. (Doc. # 64
at 17). However, whether Underwriters provided a copy of
the policy, or other notice of the relevant provision, to 3D
is a genuine issue of material fact that precludes the entry
of summary judgment on this issue. 3D's motion for a
declaration that Underwriters waived its defense of
noncoverage on this basis is therefore denied.

Second, 3D submits that Underwriters is estopped from
relying on the protective safeguard provision to deny 3D's

claim based on Underwriters's acts regarding 3D's business property. (Doc. # 64 at 7). 3D asserts that where the acts and conduct of an insurer after a loss are inconsistent with a defense of noncoverage, and the insured relies on those acts and conduct, the insurer is estopped from raising a noncoverage defense.

According to 3D, Underwriters is estopped from raising a noncoverage defense because it: (i) ordered the seizure and sale of 3D's business property without contractual basis; (ii) ordered that funds from the sale of 3D's property be provided to Underwriters; (iii) retained the funds from the date of the sale until the time of Underwriters denied 3D's claim; (iv) retained the funds from the sale after Underwriters denied the claim; (v) failed to give prompt notice of the recovery of the property to 3D; and (vi) failed to give 3D the option to have the property returned. (Doc. # 64 at 7).

Unless the facts are undisputed or only one reasonable inference may be drawn therefrom, whether the facts establish waiver is a question of fact for the jury to decide. <u>In re S&I Invs.</u>, 411 B.R. 447, 451 (Bankr. S.D. Fla. 2009); <u>Rutiq v. Lake Jem Land Co.</u>, 20 So. 2d 497, 499

(Fla. 1945); <u>Clear Channel Metroplex, Inc. v. Sunbeam Television Corp.</u>, 922 So. 2d 229, 232 (Fla. 3d DCA 2005). Here, the circumstances surrounding the salvage and sale of 3D's business property are shrouded in factual inconsistency. Whether 3D relied on Underwriters's acts, and further, whether the seizure and sale of the business property was consistent with the policy, are genuine issues of material fact. While 3D asserts that its property was taken and sold without 3D's knowledge or consent, Underwriters maintains that 3D consented to the salvage and was offered payment. (Doc. # 64 at 4-5; Doc. # 63-3 at 27-30, 64, 22-23; Doc. #63-8). This material disagreement precludes the entry of summary judgment. Therefore, 3D's motion for a declaration that Underwriters is has waived, or is estopped from asserting, a defense of noncoverage is denied.

Next, 3D asserts that Underwriters has waived its right to assert that Ocala is not covered by the mortgagee endorsement. (Doc. # 64 at 7-8). Before the fire, 3D submits, Underwriters specifically endorsed the policy to list Ocala as a mortgagee. (Doc. # 64 at 7). Underwriters does not dispute that Ocala was listed as a mortgagee on the

policy, (Doc. # 70 at 4), but maintains that it is undisputed that Ocala is not actually a mortgagee. (Doc. # 70 at 5; Doc. # 63-2 at ¶ 1; Doc. # 71-4 at 45, 124-25). In fact, Underwriters points out that Ocala itself has never claimed that it was a mortgagee, and in Ocala's own action against Underwriters, it only alleges that it is a loss-payee. (Doc. # 70 at 13; Doc. # 63-2; Doc. # 69-2).

To prevail on its theory, 3D must prove by the preponderance of the evidence that: (i) Underwriters possessed a right, privilege, advantage, or benefit which may be waived; (ii) Underwriters had actual or constructive knowledge of the right, privilege, advantage, or benefit; and (3) Underwriters expressed an intention to relinquish or give up the right, privilege, advantage, or benefit. Bristol West Ins. Co. v. Albertson, 41 So. 3d, 378, 381 (Fla. 4th DCA 2010).

A genuine issue of material fact remains as to whether Underwriters intended to give up its right to dispute Ocala's qualification as a mortgagee. Therefore, 3D's motion for a declaration that Underwriters has waived its right to contest Ocala's qualification as a mortgagee is denied.

-23-

Finally, 3D reasons: (i) the mortgagee endorsement provides that no act of 3D can invalidate payment of benefits to Ocala; (ii) 3D relied to its detriment on the mortgagee endorsement; and therefore (iii) 3D is entitled to a declaration that regardless of the application of the protective safeguard, Underwriters must pay Ocala under the policy. (Doc. # 64 at 14, 22). Because genuine issues of material fact remain as to whether Ocala qualifies as a mortgagee, and whether Underwriters intended to relinquish its right to dispute Ocala's qualification as a mortgagee, 3D's motion for a declaration that Underwriters must pay Ocala under the mortgagee provision is denied.

### 2. **Breach of Contract**

3D presents four theories by which it argues that the Court should grant summary judgment on its breach of contract claim. (Doc. # 64 at 8). First, 3D proposes that Underwriters breached the insurance contract when it "wrongfully failed to pay" Ocala and 3D under the insurance policy, based on the protective safeguard condition as to the fire alarm. (Doc. # 64 at 8). It appears that 3D seeks to incorporate its earlier arguments as to the protective safeguard provision here, specifically: (i) that

Underwriters did not provide a copy of the policy containing the protective safeguard condition to 3D such that Underwriters is precluded from enforcing the protective safeguard condition against 3D to deny coverage (Doc. # 64 at 6-7); and (ii) that Underwriters waived the protective safeguard defense in light of Underwriters's acts surrounding the salvage and sale of 3D's business property (Doc. # 64 at 7).

This Court has determined that genuine issues of material fact remain as to whether Underwriters provided 3D with a copy of the insurance policy and whether Underwriters conducted the salvage and sale in a manner consistent with the policy.   The Court denies 3D's Motion for Summary Judgment as to breach based on the same genuine issues of material fact.

Next, 3D alleges that Underwriters breached the "recovered property" provision of the policy when it failed to promptly notify 3D regarding the recovery of the property and failed to give 3D the option to request the return of the property.  (Doc. # 64 at 8).  It is undisputed, 3D argues, that Underwriters recovered the property prior to the loss settlement, failed to give notice, failed to

provide for the return of the property, unilaterally ordered the sale of the property, denied 3D's claim, and nevertheless, retained funds from the sale of the property. 3D concludes that this conduct constitutes a breach of the insurance contract. (Doc. # 64 at 9).

Underwriters presents a much different version of the facts surrounding the sale and salvage of 3D's property. Underwriters asserts that 3D was aware of the salvage, consented to it, and was offered payment. (Doc. # 64 at 4-5; Doc. # 63-3 at 27-30, 64, 22-23; Doc. # 63-8). A genuine issue of material fact remains as to whether the seizure and sale of the business property occurred in a manner consistent with the insurance policy. Therefore, 3D's Motion for Summary Judgment as to its breach of contact claim on this theory is denied.

As its final argument regarding breach, 3D states that the protective safeguard provision specifically requires that for a violation of the provision to be attributable to 3D, the fire alarm must be under 3D's control. (Doc. # 64 at 9). 3D submits that the fire alarm was under Ocala's complete control, such that this provision is not applicable against 3D. (Doc. # 64 at 9). In essence, here 3D argues

that Underwriters may not rely on the protective safeguard provision without breaching the contract.

However, inconsistencies abound as to whether a fire alarm system was in existence on the property, and if so, who maintained it. At his April 22, 2008, examination under oath, 3D owner Raymond Daher, answered "no" when questioned whether his landlord, Ocala, maintained a fire alarm. (Doc. # 71-5 at 96-97). Underwriters asserts that 3D "originally admitted that it did not have a fire alarm system" and "knew that the alarm system installed in the building . . . was not a fire alarm." (Doc. # 71-5 at 62, 96-97).

3D counters that Ocala maintained "a security system" which was "connected to a central station." (Doc. # 63-2, at ¶ 8). However, Underwriters points out that 3D bases this assertion solely on Ocala's admission that it maintained an alarm system for the period of time when Ocala occupied the premises, which "excludes the period of time that 3D occupied the property." (Doc. # 70 at 3).

A genuine issue of material fact remains as to whether a fire alarm system was in existence on the property, and if so, whether the fire alarm was under 3D's control such that a violation of the condition may be attributable to 3D.

-27-

3D's Motion for Summary Judgment as to its breach of contact claim on this theory is therefore denied.

### 3. **Conversion**

Alternatively, 3D submits that Underwriters converted 3D's property as a matter of law, when the property was seized and sold, without 3D's knowledge or consent. (Doc. # 64 at 9). To establish a claim for conversion, 3D must prove that Underwriters unlawfully exercised control over 3D's property to the detriment of 3D. Gerber Trade Fin., Inc. v. Bayou Dock Seafood Co., Inc., 917 So. 2d 964, 967 (Fla. 3d DCA 2005). However, where a party consents to another's control over his property, a cause of action for conversion will not lie. Nat'l Bank of Melbourne & Trust Co. v. Batchelor, 266 So. 2d 185, 187 (Fla. 4th DCA 1972).

Again, material facts as to the sale and salvage of 3D's property remain at issue. 3D asserts that Underwriters unlawfully seized and sold its property, because Underwriters lacked a "contractual right to take possession of the property, sell it, or order its disposal." (Doc. # 64 at 10). Underwriters submits that 3D consented to the salvage and sale. (Doc. # 64 at 4-5; Doc. #63-3 at 27-30, 64, 22-23). Because a genuine issue of material fact

remains as to whether 3D consented to the seizure and sale of its business property, 3D's Motion for Summary Judgment as to its conversion claim is denied.

**B.   Underwriters's Motion for Summary Judgment**

First, Underwriters argues that this Court should find that Ocala is solely a loss-payee, not a mortgagee, such that Ocala may recover only if 3D also recovers under the policy. (Doc. # 73 at 4-5). It is undisputed that while Ocala does not actually hold a mortgage on the insured property, Ocala was listed as a mortgagee on the policy. (Doc. # 83 at 10; Doc. # 70 at 4).

Underwriters fails to address 3D's contention that Underwriters has waived, or is estopped from exercising, its right to assert that Ocala is not covered by the mortgage endorsement. (Doc. # 83 at 10-13). Under Florida law, "determination of a waiver is a factual inquiry for the trier of fact." In re S&I Invs., 411 B.R. 447, 451 (Bankr. S.D. Fla. 2009); see Rutig v. Lake Jem Land Co., 20 So. 2d 497, 499 (Fla. 1945); Clear Channel Metroplex, Inc. v. Sunbeam Television Corp., 922 So. 2d 229, 232 (Fla. 3d DCA 2005). A genuine issue of material fact remains as to whether Underwriters intended to relinquish its right to

dispute Ocala's qualification as a mortgagee. Underwriters's Motion for Summary Judgment as to this issue is denied.

Next, Underwriters submits that there is no dispute "that there was not a functioning alarm system that was connected to a central station or reported to a fire alarm station" on the insured property. (Doc. # 73 at 6). Underwriters maintains that 3D violated a protective safeguard provision in the policy, such that the Court should find that Underwriters is relieved from any obligation to pay under the policy. (Doc. # 73 at 6).

3D points out that Underwriters fails to address 3D's argument that Underwriters waived its right to assert the protective safeguard provision. (Doc. # 83 at 13). 3D maintains that Underwriters waived its right to assert the protective safeguard provision, first, by failing to provide 3D with a copy of the insurance policy. (Doc. # 64 at 7). However, Underwriters submits that 3D received a copy of policy through 3D's insurance agent, Insurance Service of Sarasota, and that 3D's owner received a copy of the policy. (Doc. # 71-7 at 64-65; Doc. # 63-1 at 12-13).

According to 3D, Underwriters also waived its protective safeguard defense by its actions surrounding the

salvage and sale of 3D's business property. (Doc. # 83 at 14). However, Underwriters asserts that 3D consented to the salvage and sale. (Doc. # 63-3 at 27-30, 64, 22-23).

In addition, 3D notes that Underwriters fails to address an additional lingering factual dispute as to its protective safeguard defense- whether 3D "had control" over the fire alarm system- such that the exclusion may apply. (Doc. # 83 at 13). Pursuant to the relevant policy provision: "We will not pay for loss caused by or resulting from fire, if, prior to the fire, you: . . . Failed to maintain any protective safeguard listed in the Schedule above, and over which you had control, in complete working order." (Doc. # 1-3 at 21). While 3D maintains that Ocala had control over the fire alarm system, 3D concedes that the "record evidence creates a factual dispute which precludes summary judgment as on the issue of control." (Doc. # 83 at 14).

Genuine issues of material fact remain as to: (i) whether Underwriters provided a copy of the policy containing the protective safeguard provision to 3D; (ii) whether Underwriters conducted the seizure and sale of the property in a manner consistent with the policy; and (iii)

whether 3D had control over the fire alarm system. Therefore, Underwriters's Motion for Summary Judgment that Underwriters is relieved from any obligation to pay under the insurance policy based on the protective safeguard provision is denied.

Finally, as to 3D's claim for conversion, Underwriters asserts that 3D consented to the salvage and sale of 3D's business property such that the conversion claim must fail. (Doc. # 73 at 6). As stated previously, material factual issues surrounding the salvage and sale of the business property are in conflict. On one hand, 3D argues that Underwriters salvaged and sold the property without 3D's knowledge or consent (Doc. # 83 at 15), while on the other hand, Underwriters maintains that 3D was aware of the salvage and sale, and consented to it. (Doc. # 63-3 at 27-30, 64, 22-23). Whether 3D consented to the salvage and sale of its business property is a question of fact for the jury to determine. Underwriters's Motion for Summary Judgment as to 3D's conversion claim is denied.

## V.   Conclusion

For the foregoing reasons, 3D's Motion for Summary Judgment (Doc. # 64) and Underwriters's Motion for Summary

Judgment (Doc. # 73) are denied.  In addition, 3D's Motions to Strike (Docs. ## 76, 78, 79) are denied.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

(1)  3D's Motion for Summary Judgment (Doc. # 64) is **DENIED.**

(2)  Underwriters's Motion for Summary Judgment (Doc. # 73) is **DENIED.**

(3)  3D's Motions to Strike (Docs. ## 76, 78, 79) are **DENIED.**

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this <u>14th</u> day of March 2011.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies:

All Counsel and Parties of Record